(No. 14340.—Reversed and remanded.)

THE CAMP SPRING MILL COMPANY, Plaintiff in Error, *vs.*
THE INDUSTRIAL COMMISSION *et al.*—(CHARLES MAT-
THEWS,· Defendant in Error.)

*Opinion filed February 22, 1922.*

1. WORKMEN'S COMPENSATION—*finding of Industrial Commis-
sion must be according to preponderance of evidence.* The Indus-
trial Commission should weigh the evidence heard by it and make
its finding for the party in whose favor the evidence preponder-
ates; and the commission is not justified in finding for one party
merely because by a strained construction some evidence can be
found in the record which, standing undisputed, will justify its
finding, nor is it justified in basing its finding upon testimony which
all the facts and circumstances in the record show to be untrue.

2. SAME—*when an award for permanent total disability cannot
stand—practice.* An award by the Industrial Commission for per-
manent total disability which has no support in the evidence can
not stand, but if there is evidence in the record showing that the
applicant has suffered some disability as a result of the accident,
the cause, on reversal, will be remanded for a further considera-
tion of the facts by the commission.

WRIT OF ERROR to the Circuit Court of Washington
county; the Hon. LOUIS BERNREUTER, Judge, presiding.

R. E. HOWE, and P. M. WISHON, (SAMUEL A. HARPER,
of counsel,) for plaintiff in error.

A. W. THARP, and BORDERS & BORDERS, for defendant
in error.

Mr. JUSTICE THOMPSON delivered the opinion of the
court:

This writ of error is prosecuted by leave of court to
review the judgment of the circuit court of Washington
county confirming a decision of the Industrial Commission
finding that Charles Matthews, defendant in error, as the
result·of an injury received in the employ of plaintiff in er-
ror, has become wholly and permanently incapable of work,

and that he is entitled to compensation amounting to $11.70 a week for a period of 320 weeks following the injury, and thereafter a pension in the sum of $24.96 a month for the remainder of his life.

Defendant in error testified that he was fifty-four years old; that he had been employed by plaintiff in error as a common laborer for more than five years; that he was injured August 19, 1918; that at the time of his injury he was engaged with four other men in moving sacks of flour from the mill to the warehouse; that the truck was a pushcar which operated over the rails of a switch-track; that he was knocked from the truck about nine A. M. and was rendered unconscious and remained so until four P. M.; that he had a swollen place on the back of his head for several days after the injury; that he was away from work over two weeks, after which he went back to work at the same occupation; that he was paid his wages during the time he was confined to his home; that he made no claim for compensation until he was discharged from employment, about the first of October, 1918, and that he then told his employer that if he would not give him work he wanted damages, and that his boss told him that the company owed him no damages; that plaintiff in error later offered him employment, and that he told the foreman who came to see him that he was not able to do heavy work; that since his injury he had tried to work in a brickyard and in a harvest field, but he became dizzy when he got hot and had to give up the work; that before his injury he was able to do heavy work, was not nervous and his sight was good; that since the injury he had not been able to do heavy work, was very nervous, slept poorly at night and couldn't see well, and that the injury had no effect on his walking but bothered him when he stooped. In his original testimony before the arbitrator he testified that his neck was as straight as any man's neck and that his head did not jerk at all before he was injured, but after about a dozen witnesses had

testified that his neck had been crooked as long as they had known him and that his head had jerked for twelve or fifteen years, he admitted before the commission on review that he had always carried his head to one side, and that his head had jerked some for fourteen or fifteen years but was much worse since his injury. In his original testimony before the commission he testified that there was no nervousness or insanity in his family, but on cross-examination he admitted he told Dr. Graves that his father and mother were slightly afflicted and that one of his sisters had been insane for some years, and he admitted that these statements were true. He testified that since his injury he had done odd jobs about town where he could take his time at the work; that he had shoveled some coal and dirt, had carried water for concrete mixing, had mowed and raked lawns and cleaned rugs, and that for this work he received thirty-five cents an hour; that work was scarce and that he was not steadily employed, but that he put in as many as four days a week and that he was employed eight or nine hours a day; that he was regularly employed as janitor of a church and received for this service six dollars a month.

Two of the men who were working with defendant in error at the time he was injured testified that the track over which they were operating the truck ran down-grade from the warehouse to the mill, and that defendant in error was riding on the truck from the warehouse to the mill when he was knocked from the truck by striking a gang-plank which passed over the track from one side of the warehouse to the other; that he struck his head on a rail or a tie and was so dazed that he was unable to stand up and had to be helped into a motor truck, in which he was taken home.

Dr. Paul B. Rabeneck testified that he had treated the family of defendant in error for two years before his injury; that he saw him within an hour after he was injured and that he was conscious at that time; that he complained of pain in his head; that he examined him and found a

slight bruise and swelling on the back of his head; that he examined his eyes and found them normal; that there was no abrasion of the scalp and no fracture of the skull; that he had known defendant in error all his life, and that defendant in error while employed by a liveryman had driven him in his practice; that he had always had a crooked neck and that when he became excited his head shook; that he had seen him recently when his head was not shaking; that the shaking of his head during the hearing was due to excitement; that he had made a thorough examination of the body and head, including the eyes, of defendant in error and found him normal for a man of his age, and that he had noticed no difference in his physical or nervous condition since the accident.

Four lay witnesses who had known defendant in error for many years and who appear from their testimony to be disinterested witnesses, testified that he had always had a crooked neck and his head had always shaken more or less, and that they were unable to see any appreciable change in his condition since the accident.

Three doctors testified on behalf of defendant in error from single examinations made by them for the purpose of testifying. C. H. Eubanks, an optometrist of East St. Louis, made an examination of his eyesight and found the vision of both eyes seriously impaired. It was his opinion that defendant in error was nearly blind in the right eye and that the left eye was seriously affected but could be improved by the use of glasses. Defendant in error was not wearing glasses when he came to see him and did not tell him whether he had ever worn glasses. This doctor stated that he did not know what had caused the condition of the eyes of the defendant in error; that the condition could have been caused without an accident and he could not say that the condition was caused by an accident; that a portion of the loss of vision could be due to age, and that a blow at the base of the skull could have caused the

condition.   G. O. Hulick, a physician of East St. Louis, testified that he made an X-ray examination of the skull of defendant in error and found a circular scar at the base of the skull, which would be over the cerebellum; that this scar showed that there had been an injury to the back of the head; that the pressure on this part of the brain would cause paralysis; that defendant in error is now troubled with *paralysis agitans,* or what is commonly called palsy; that he is unable to control the muscular activity of his head; that the disease is progressive and will become worse rather than better; that a severe injury can produce this disease, but that he would not say that this accident produced the condition.   Dr. H. F. Killene, a physician of East St. Louis, assisted Dr. Hulick in his examination.   He testified that the X-ray picture showed a depression at the base of the brain; that he could not tell whether it was a fracture but that it probably was one; and that defendant in error has a permanent case of *paralysis agitans,* which is a condition caused by pressure on the brain.   Both of these physicians were general practitioners and had never specialized in nervous diseases.

Dr. W. W. Graves was called as a witness by plaintiff in error and testified that he had been specializing in nervous and mental diseases for nineteen years; that he was professor of nervous and mental diseases in the school of medicine of St. Louis University; that he had been a member of the faculty since 1906 and for eight years had been head of the department of nervous and mental diseases; that he examined defendant in error, and that he understood that his examination was to be impartial and as much for one side as the other; that he learned from defendant in error his family history, and found that one sister had become insane at her mother's death and that the crooked neck was a family affliction; that defendant in error told him the history of the accident and complained of his inability to sleep and the pain that he had in the back part of his head,

and that he became blind at times; that he removed the clothing of defendant in error and made a thorough examination of him; that he examined all the vital organs and made an examination of his nervous system; that he found no signs of organic disease of the nervous system and found nothing in the physical examination that in any way could be attributed to the injury; that he made a very careful examination of the point at the back of the head of defendant in error and found that his complaint was the same whether he touched the point lightly or firmly and that there was no evidence of pain in the patient's facial expression; that he found no scar at the point of the injury and no evidence of a former fracture; that he found nothing in his examination of his nervous system which showed that the brain was in any way involved by the injury; that he examined his eyes and found nothing wrong with the pupils of the eye or the re-action; that defendant in error had a memorandum book, in which he found the page and read the memorandum with the aid of glasses which he was then wearing; that he told the doctor that he read his Bible with these same glasses, and that it was his opinion that the blow on the back of the head of defendant in error had had no effect whatever on his vision. He described his condition as known as mental torticollis,—a condition which begins in youth and remains practically unchanged through the life of the individual; that it is also intensified by excitement and anxiety or by anything that is out of the ordinary; that the excitement and anxiety incident to this hearing or claim for damages would serve to intensify and perpetuate the condition, which had existed for a long time in defendant in error, and that the condition would continue until the case was finally adjudicated and then it would disappear.

The records of plaintiff in error show that defendant in error received $18 a week during the time of his employment by it, which was thirty cents an hour for a sixty-hour week; that he was paid full wages during the three weeks

that he was away from work; that he returned September 9 and was paid full wages until he was discharged, in October; that he was not discharged because of any physical disability, but was discharged, with many other employees, because the business of the mill had become slack and his services were no longer needed.

No reasonable man fairly weighing this evidence can come to the conclusion that defendant in error is wholly and permanently incapable of work. The testimony of defendant in error, standing alone and undisputed, would not support the decision of the Industrial Commission. That the Industrial Commission should weigh the evidence heard by it and make its finding for the party in whose favor the evidence preponderates has been stated by us so often that the statement has become trite. The commission is not justified in finding for one party merely because by some strained construction some evidence can be found in the record which, standing undisputed, would justify its finding, nor is it justified in basing its finding upon testimony which all the facts and circumstances in the record show to be untrue. The Workmen's Compensation act was adopted for the purpose of providing just compensation for injuries arising out of industrial accidents, and this beneficent purpose will be destroyed if the act is construed to be an act pensioning persons who suffer from disabilities and pre-existing diseases not caused by industrial accidents. Manifestly, the finding of the Industrial Commission that the defendant in error is wholly and permanently incapable of work cannot stand, and the circuit court erred in refusing to set aside the decision. On the other hand, it cannot be said that there is no evidence in the record showing that defendant in error has suffered a disability as a result of this accident, and the cause must be remanded to the Industrial Commission for a further consideration of the facts.

The judgment is reversed and the cause is remanded to the circuit court, with directions to refer the claim to the

Industrial Commission for further consideration upon the record now presented and any further evidence the parties may choose to present.

*Reversed and remanded, with directions.*

---

(No. 14372.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ANTHONY JUDYCKI, Plaintiff in Error.

*Opinion filed February 22, 1922.*